# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| M.C. through her mother and next friend ERIN CHUDLEY; S.W. through her mother and next friend HELEN WHISLER; and G.A. through her mother and next friend DEBORAH ALTENHOFEN, | Case No. 18-2283-JAR-KGG |
| **Plaintiffs,** | |
| v. | |
| SHAWNEE MISSION UNIFIED SCHOOL DISTRICT NO. 512 (a/k/a the "SHAWNEE MISSION SCHOOL DISTRICT") and KENNETH SOUTHWICK, in his Individual and Official Capacity as Interim Superintendent of Shawnee Mission School District, | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiffs, who are all minor students in the Shawnee Mission School District ("SMSD" or "the District"), bring this action by and through their next friends under 42 U.S.C. § 1983 and the Kansas Student Publications Act, for claims arising out of the District's conduct during the April 20, 2018 national school walkout to protest gun violence. Before the Court is Defendants SMSD and Kenneth Southwick's Joint Motion to Dismiss Plaintiffs' Complaint (Doc. 8). The motion is fully briefed and the Court is prepared to rule. As described more fully below, the motion is granted as to Defendant Southwick on the § 1983 claims alleged in Count I. The motion is denied as to Defendant SMSD on Count II. Defendants' motion to dismiss Count III is also denied.

# I. Legal Standard

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above the speculative level" and must include "enough facts to state a claim for relief that is plausible on its face."[1] Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[2] The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but requires more than "a sheer possibility."[3] "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[4] Finally, the court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[5]

The Supreme Court has explained the analysis as a two-step process. For purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'"[6] Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[7] Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an

---

[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

[2] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[5] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

[6] *Id.* (citing *Twombly*, 550 U.S. at 555).

[7] *Id.* at 678–79.

entitlement to relief."[8]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[9]

## II.  Factual Allegations

The following facts are alleged in the Complaint and assumed to be true for the purposes of deciding this motion.

Students across the country, including the named Plaintiffs in this action and their fellow students, organized a national walkout on April 20, 2018, to advocate for reforms to reduce gun violence in the wake of the tragic Parkland High School shootings in Florida.  Students selected the date of the walkout to coincide with the 19th anniversary of the Columbine High School Massacre; and the walkout was specifically organized for the purpose of demanding reforms intended to reduce the prevalence of gun deaths and school shootings in the United States. Student organizers at various SMSD sites informed administrators in advance of the protests that they intended to participate as part of the national walkout.  Defendants informed parents that students would be permitted to participate in the walkouts without risking discipline.  However, Defendants made clear to parents and students that the walkouts were student-led and optional, and that the District was not sponsoring the event.

SMSD issued a directive to all building administrators, encouraging and directing them to prohibit students from discussing guns, gun control, and school shootings—the central topics of the planned protests — during the walkouts.  Specifically, according to SMSD spokesperson Shawna Samuel, the District "encouraged the students to keep the topic to school safety," and

---

[8]*Id.* at 679.

[9]*Id.* at 678.

steered students away from discussing guns.[10] SMSD adopted these guidelines, according to Samuel's statements, because "[a]s a public institution, we cannot take a stand one way or the other on Second Amendment rights."[11]

At Hocker Grove Middle School ("Hocker Grove"), assistant principal Alisha Gripp began to interfere with students' speeches after the second speaker cited a statistic that there had been nineteen school shootings in the previous year, and stated that "we would have more shooters who were women, queer, transgender, and people of color if bullying caused school shootings."[12] Gripp informed students, "No shootings, no deaths. If you can't comply with the rules, you'll be removed."[13] Gripp confiscated the written remarks of another scheduled speaker because they mentioned gun control.

Plaintiff M.C. is an eighth-grade student enrolled in Hocker Grove who helped organize the walkout there. Defendants informed Hocker Grove students such as M.C. and their parents that students would not be disciplined if they participated in the walkout. M.C. was the third scheduled speaker. She spoke two lines of her prepared speech, stating that "the school administration wants us to keep this about school violence and not about the real issue here. The real issue is gun violence,"[14] before an administrator interrupted M.C. and ordered her to step down from the speaking platform. She complied without protest. Gripp then abruptly declared an end to the event. Because nine minutes remained in the planned seventeen-minute event,

---

[10] Doc. 1 ¶ 34 (quoting Jay Senter, *Tensions Mount over Shawnee Mission Administration's Move to Censor, Limit Access to National School Walkout Demonstrations*, SHAWNEE MISSION POST (Apr. 23, 2018), https://shawneemissionpost.com/2018/04/23/tensions-mount-over-shawnee-mission-administrations-moves-to-censor-limit-access-to-national-school-walkout-demonstrations-70953).

[11] *Id.* ¶ 35 (quoting Senter, *supra* note 10).

[12] *Id.* ¶ 38.

[13] *Id.* ¶ 39.

[14] *Id.* ¶ 41.

approximately fifty students remained outside with the intention of continuing the planned program.  Gripp then directed the remaining students to disperse, pushing several students toward the school door.

A number of Hocker Grove students were then told that they had either been suspended or had detention for participating in the walkout, including M.C., who was sent home for "being the most disruptive child in the school."[15]  Students returning to class were not stopped from exercising speech rights unrelated to the walkout, including loudly yelling, "It's Hitler's birthday today," and "Free Meek Mill!"[16]  According to witnesses, no administrator or teacher tried to censor these students' statements, or told them to return to class.

At Shawnee Mission North High School ("SMN"), students were permitted to hold a walkout program from 10:00 to 10:17 a.m. at a designated location on school grounds.  Several days before the protests, however, administrators told students that they could not mention shootings or gun violence.  The students who spoke during the school-permitted walkout time apparently complied with this request.  More than 100 students, however, remained outside the school after the end of the school-permitted program to discuss the subjects the school would not allow them to speak about during the approved walkout: mass shootings and gun-policy reforms.

Administrators generally permitted students to remain outside during the "unsanctioned" event, except for student journalists.  At the beginning of the unsanctioned walkout program, SMN Assistant Principal Brock Wenciker expressly directed journalism students to return to the building.  Plaintiff S.W. is a junior enrolled at SMN.  In her capacity as a student journalist she was attempting to document the protests for the school when Wenciker approached her and

---

[15]*Id.* ¶ 44.

[16]*Id.* ¶ 45.

ordered her to hand over the camera she was using. The camera belongs to the District but was checked out to S.W. for the year to use in her role as a student journalist. Wenciker informed S.W. he believed he could rightfully confiscate the camera because it was school property. Wenciker confiscated at least one other student's camera during the unsanctioned protest as well.

During the unsanctioned program, students expressed a diversity of views and proposals on how to reduce gun violence. Some students, for example, advocated for a ban on assault rifles while others argued that schools should arm teachers and school staff. S.W. stayed after school to get the camera back, at which point Wenciker returned it to her without explanation.

Plaintiff G.A. is a junior enrolled at SMN. G.A. attended the SMN walkout event primarily as a protestor but also is a student journalist who works for the school newspaper, *The Mission*. G.A. was denied the opportunity to hear the messages that students originally intended to express at the walkout. On April 23, 2018, G.A. spoke to the SMSD board and complained about the censorship activities that took place at her school. During this meeting, Defendant Kenneth Southwick, the interim Superintendent at that time, issued a "personal apology" for unspecified actions, and pledged to fully review the incidents.

On April 26, 2018, the American Civil Liberties Union ("ACLU"), on behalf of several named Plaintiffs in this action, sent the District a letter demanding that it commit to a proposed corrective action for each impacted student by Thursday, May 3, 2018. The district issued another apology communication to parents on Friday, April 27.

On May 2, 2018, Southwick met with S.W. as part of the District's investigation. When S.W. expressed disappointment that she was unable to continue to document the walkouts after Wenciker confiscated the camera, Southwick dismissed her concerns and asked her why she did not use her iPhone. Southwick also met with G.A. on May 2, 2018. Southwick insisted that the

law was open to interpretation and declined to acknowledge that Wenciker's conduct violated students' rights. Despite G.A.'s multiple attempts to discuss censorship, Southwick spent the majority of his meeting with G.A. inquiring about the actions of students that he sought to characterize as disruptive, as well as the actions of a member of the press who attended the event.

On May 7, 2018, Southwick addressed a special meeting of the SMSD Board to give them an update on his investigation into the censorship allegations. Southwick described his investigation as a chance to "first of all begin to look at what it was that we did right."[17] Southwick then informed the board and the public that he would not be spending too much time investigating this issue with graduation coming, and that his own investigation would "pick up after school is out."[18] When asked about any planned trainings for SMSD higher-ups on student First Amendment issues, Southwick responded that he had spoken to multiple SMSD attorneys and two outside agencies about doing a panel discussion "[be]cause as you can imagine, our attorneys make money on having varying opinions."[19] Southwick stated that he envisioned the panel as an opportunity "to discuss issues around student rights, but basically other issues as well that operate on a day to day basis," and said he hoped to have this discussion at an upcoming administrators' retreat if allowed to do so.[20]

While Southwick claimed that the Board would accept its mistakes if and when it is determined they made mistakes, he stated, "[a]t the same time, more important than that, we're going to move forward and make sure that in subsequent events we continue to keep students and

---

[17] *Id.* ¶ 62 (quoting Kenneth Southwick, SMSD Special Board Meeting (May 7, 2018), https://www.youtube.com/watch?v=uU9ngmNYfeg).

[18] *Id.* ¶ 63 (quoting Southwick, *supra* note 17).

[19] *Id.* ¶ 64 (quoting Southwick, *supra* note 17).

[20] *Id.*

staff safe, but we also, very importantly, maintain the integrity of the classroom time that we have.  That's our primary focus[.]"[21]

### III.   Section 1983 Claims for Violations of the First and Fourteenth Amendments

Pursuant to 42 U.S.C. § 1983, any person who "under color of . . . [law] . . . subjects, or causes to be subjected, . . . any [person] . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  Section 1983 does not create any substantive rights.[22]  Rather, § 1983 provides only a right of action to remedy a violation of a right secured by the Constitution or laws of the United States.[23]  Although the parties dispute the contours of the § 1983 claims alleged in Counts I and II, the Court construes Count I as alleging individual and official capacity claims against Southwick, and Count II as alleging a municipal liability claim against the District.  Both claims are premised on violations of Plaintiffs' First Amendment rights to free speech and free press.

When a plaintiff sues a government employee such as Southwick in his official capacity under § 1983, the plaintiff pleads an action against the government employer.[24]  In *Kentucky v. Graham*, the Supreme Court held that "as long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than a name, to be treated as a suit against the entity."[25]  Thus, while a damages award against an official in his individual capacity can only be executed against the official's personal assets, damage awards in an official capacity suit must come from the government entity.[26]

---

[21]*Id.* ¶ 65 (quoting Southwick, *supra* note 17).

[22]*Dixon v. City of Lawton, Okla.*, 898 F.2d 1443, 1447 (10th Cir. 1990).

[23]*Id.*; *Nelson v. Geringer*, 295 F.3d 1082, 1097 (10th Cir. 2002).

[24]*Monell v. N.Y. City Dep't of Soc. Serv.*, 436 U.S. 658, 690 (1978).

[25]473 U.S. 159, 166 (1985) (citing *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985)).

[26]*Id.*

Plaintiffs seek to hold Southwick responsible for alleged constitutional violations in both his individual and official capacities. Because official capacity suits are treated as suits against the entity, Plaintiffs' claims against Southwick in his official capacity are duplicative of the claims against SMSD alleging the same violations.[27] Therefore, the Court dismisses Plaintiffs' official capacity claims against Southwick as duplicative. Below, the Court considers the remaining claims alleged in the Complaint: the official capacity claims against the District and the individual-capacity claims against Southwick.

### A.    Standards for Reviewing School Speech under the First Amendment

The First Amendment guarantees freedom of speech and applies to the states through the Due Process Clause of the Fourteenth Amendment.[28] Students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."[29] Yet, under the Supreme Court's jurisprudence, "the constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings."[30] Schools must be given authority "consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."[31]

Plaintiffs' alleged expressive activity during the April 20, 2018 walkout is protected speech under the First Amendment. Pure speech, such as M.W.'s is clearly protected under the First Amendment.[32] And "where a speaker exists, as is the case here, the protection afforded is

---

[27]*Id.* at 167 n.14; *Monell*, 436 U.S. at 691 n.55; *Moore v. Bd. of Cty. Comm'rs of Cty. of Leavenworth*, 470 F. Supp. 2d 1237, 1255 (D. Kan. 2007).

[28]*See, e.g.*, *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

[29]*Tinker v. Des Moines Indep. Comm'y Sch. Dist.*, 393 U.S. 503, 506 (1969).

[30]*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986).

[31]*Tinker*, 393 U.S. at 507.

[32]*Cox. v. Louisiana*, 379 U.S. 536, 555 (1965).

to the communication, to its source and to its recipients both."[33]  The First Amendment also protects the creation of speech, including the recording of matters of public interest for purposes of newsgathering.[34]

Whether the District's restrictions on student expression violated the First Amendment turns on the type of school speech and forum involved.  The general rule announced in *Tinker v. Des Moines Independent Community School District* is that a public school must be able to show that the speech at issue "would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school'" in order to justify a prohibition of students' expression.[35]  "[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."[36]

Several exceptions to this rule have emerged since the *Tinker* decision.  First, vulgar, lewd, and offensive speech is governed by *Bethel School District No. 403 v. Fraser*, and can be restricted without a showing of material and substantial disruption.[37]  Second, "school-sponsored" speech that a school "affirmatively . . . promote[s]" in a nonpublic forum is governed by *Hazelwood School District v. Kuhlmeier*, and can be restricted if the school's "actions are reasonably related to legitimate pedagogical concerns."[38]  Finally, the Supreme Court has carved

---

[33]*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 758 (1976).

[34]*See, e.g.*, *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1196–97 (10th Cir. 2017).

[35]*Tinker*, 393 U.S. at 509 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)).

[36]*Id.* at 508.

[37]478 U.S. 675, 685 (1986).

[38]484 U.S. 260, 273 (1988).

out a narrow exception that allows schools to prohibit student speech that it "reasonably view[s] as promoting illegal drug use."[39]

### 1.    Whether the Speech is School Sponsored

The parties in this case dispute whether the speech at issue is governed by the less rigorous test in *Hazelwood* that applies to "school-sponsored" speech.   The *Hazelwood* Court considered a public school's decision to censor two articles in the student newspaper that touched on controversial and mature subjects.  The Court began its analysis by discussing whether the student newspaper in that case was a limited public forum less susceptible to restrictions.[40]  If no public forum was created by the school, the Court explained, "then . . . school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community."[41]  The Court extensively considered the school district's policies pertaining to the newspaper, the fact that members of a journalism class produced the newspaper's content, and the extent of control exercised by school officials over the content of the newspaper.[42]  Based on the record before it, the Court concluded that,

> [s]chool officials did not evince either "by policy or by practice," any intent to open the pages of Spectrum to "indiscriminate use," by its student reporters and editors, or by the student body generally.  Instead, they "reserve[d] the forum for its intended purpos[e]," as a supervised learning experience for journalism students.[43]

---

[39]*Morse v. Frederick*, 551 U.S. 393, 409 (2007).  Also worth mentioning is the standard for "government speech," such as when a principal speaks at a school event.  *See Fleming v. Jefferson Cty. Sch. Dist. R-1*, 298 F.3d 918, 923 (10th Cir. 2002).  "When the government speaks, it may choose what to say and what not to say."  *Id.*

[40]*Hazelwood*, 484 U.S. at 267–70.

[41]*Id.* at 267.

[42]*Id.* at 267–70.

[43]*Id.* at 270 (citations omitted) (quoting *Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 47 (1983)).

Therefore, the Court held that *Tinker* did not govern its decision; a reasonableness inquiry guided the Court's decision instead.[44]

The Supreme Court explained the distinction between speech governed by *Tinker*, and school-sponsored speech as follows:

> The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.
>
> Educators are entitled to exercise greater control over this second form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.[45]

The Tenth Circuit describes *Hazelwood* as requiring "the imprimatur and pedagogical interests of the school."[46] The imprimatur requirement will apply to speech that is "so closely connected to the school that it appears the school is somehow sponsoring the speech."[47] To make this determination, the Court looks to whether the school allowed the speech "to be

---

[44]*Id.*

[45]*Id.* at 270–71 (footnote omitted).

[46]*Fleming v. Jefferson Cty. Sch. Dist. R-1*, 298 F.3d 918, 924 (10th Cir. 2002).

[47]*Id.* at 925.

integrated permanently into the school environment."[48]  The Court should also consider "the level of involvement of school officials in organizing and supervising an event."[49]

   *Hazelwood* itself involved speech by three former high school students who were members of the school's newspaper.[50]  They claimed First Amendment violations when the school principal directed the journalism teacher to delete two pages of the students' newspaper stories discussing student experiences with pregnancy and the impact of divorce.[51]  The Court found that the speech was school sponsored after considering the school's policies and practices toward the school newspaper.[52]  In making this finding, the Court reasoned that the school board's policies pertained to "school-sponsored publications," that newspaper stories were produced by students in a Journalism class, and that the class and newspaper were supervised by the Journalism teacher who had final authority on publication decisions, and was subject to review by the school principal.[53]

   Three decisions by the Tenth Circuit applying the *Hazelwood* standard are also instructive on the question of school imprimatur.  In *Fleming v. Jefferson County School District R-1*,[54] the court considered Columbine High School's restrictions on a project in which students and outside community members painted 4-inch-by-4-inch tiles to be installed throughout the school's hallways.  The project's purpose was to allow those impacted by the Columbine school shooting an opportunity to participate in reconstructing the school in a way that would help

---

[48]*Id.*

[49]*Id.*

[50]*Hazelwood*, 484 U.S. at 262–63.

[51]*Id.* at 263.

[52]*Id.* at 268–69.

[53]*Id.* at 269–70.

[54]298 F.3d 918 (10th Cir. 2002).

"avoid sensory cues that could reactivate memories of the attack," and "reacquaint students with the building."[55]  In determining that the tile project bore the imprimatur of the school, the court found important that the tiles would become a permanent part of the school building.[56]  "When coupled with organizing, supervising, approving the funding, and screening the tiles, the school's decision permanently to mount them on the walls conveys a level of approval of their message."[57]  The degree of school involvement in the project, combined with the permanent effects of the paintings were sufficient to demonstrate school imprimatur.[58]

In *Corder v. Lewis Palmer School District No. 38*,[59] the Tenth Circuit considered a high school's discipline of one of its students based on the content of her valedictory speech at a graduation ceremony, during which she discussed her religious views without the principal's prior approval.[60]  The court found that the imprimatur prong of *Hazelwood* was "easy to satisfy," because the speech was delivered at the school's graduation ceremony, which was "clearly a school-sponsored event," given the degree of control that the school exercised over choosing the speakers and reviewing the content of the valedictory speeches ahead of time.[61]

Finally, in *Taylor v. Roswell Independent School District*,[62] a group of high school students belonging to a religious youth group challenged a school district's decision to prohibit them from distributing rubber fetus dolls to other students before school, and requiring

---

[55]*Id.* at 920–21.

[56]*Id.* at 930.

[57]*Id.*

[58]*Id.* at 931.

[59]566 F.3d 1219 (10th Cir. 2009).

[60]*Id.* at 1222–23.

[61]*Id.*

[62]713 F.3d 25 (10th Cir. 2013).

preapproval by the school before distribution of any non-school-sponsored material on school grounds.[63]  The students' youth group was affiliated with a local church but not with any school.[64]  The Tenth Circuit found that *Hazelwood* did not apply because the speech at issue was not school sponsored.[65]  The court found that "'[n]o one would reasonably believe' the distribution of rubber fetuses 'bore the school's imprimatur.'  As in *Tinker,* Plaintiffs were expressing their private views, and their expression was not part of any school-sponsored program."[66]

> a.      **Speech Restrictions During the Walkout**

Defendants point to the following facts in support of their contention that the student speech during the walkout was school sponsored: (1) the demonstrations occurred during school hours; (2) the demonstrations occurred on school property; (3) students were allowed to attend; (4) the demonstrations were supervised by District personnel; (5) the begin and end times were determined by building administrators; and (6) SMN created a "sanctioned" and "unsanctioned" event, allowing students to remain outside during the unsanctioned event and use unrestricted speech.  Plaintiffs lean on their allegation that the District undertook substantial efforts to educate students and parents that the April 20, 2018 walkouts were neither endorsed nor sponsored by the schools, and argue that the public could not reasonably believe that the national walkout was sponsored by the school.  They further argue that the facts upon which Defendants rely are either inaccurate recitations of the facts alleged in the Complaint, or not indicia of school-sponsored speech.

---

[63]*Id.* at 29–33.

[64]*Id.* at 29.

[65]*Id.* at 35. The court ultimately affirmed the district court's decision that the school's restrictions were permissible under the *Tinker* standard.  *Id.* at 39.

[66]*Id.* at 36 (quoting *Morse v. Frederick*, 551 U.S. 393, 405 (2007)).

At this stage of the proceedings, the Court accepts as true the well-pled facts in the

Complaint.  These facts require application of the *Tinker* standard to the District's restrictions on

speech during the walkout because it was not school sponsored.  According to the Complaint:

> 31.     Defendants informed parents that students would be
> permitted to participate in the walkouts without risking discipline.
> However, Defendants made clear to parents and students at both
> schools that the walkouts were student-led and optional, and that
> the District was not sponsoring the event.
>
> . . . .
>
> 33.     On information and belief, however, SMSD had issued a
> centralized directive to all building administrators, encouraging
> and directing them to prohibit students from discussing guns, gun
> control, and school shootings—the central topics of the planned
> protests — during the walkouts.
>
> . . . .
>
> 36.     In other words, while making clear to students and parents
> that the event was not school-sponsored speech, Defendants
> nonetheless made behind-the-scenes plans to impose their own
> content-based restriction on the protests, out of an abstract desire
> to avoid controversy.[67]

The fact that the District made clear to students and parents that the event was not school

sponsored distinguishes this case from *Hazelwood*, *Fleming*, and *Corder*.  Those cases involved

a much higher level of school involvement in the forum giving rise to the speech at issue: a

student newspaper in *Hazelwood*, the tile project in *Fleming* conceived of and overseen by

school officials, a graduation speech in *Corder*.  In contrast, the event in this case was organized

by students at the national level.  Students chose the date specifically to coincide with the

anniversary of the Columbine High School tragedy, and they hoped to demand reforms to reduce

gun deaths and school shootings throughout the country.  It is reasonable to infer from the facts

---

[67]Doc. 1 ¶¶ 31, 33, 36.

alleged in the Complaint that the public would have understood that the walkout was not sponsored by the school, but was instead a nationally organized student-led event.

The Complaint also alleges that students in the SMSD notified the District in advance of the walkout that they intended to participate. Although the District responded that it would not discipline students for participating, they "made clear to parents and students at both schools that the walkouts were student led and optional, and that the District was not sponsoring the event."[68] These facts, assumed to be true for purposes of this motion, indicate that the speech at issue was merely being tolerated, as opposed to sponsored by the school.

Moreover, the alleged facts upon which the District relies in arguing the speech was school sponsored do not undercut the Plaintiffs' allegation that the District did not endorse or sponsor the event. That the walkout occurred during school hours and on school grounds does not dictate a finding that the speech was school sponsored. Indeed, the speech at issue in *Tinker*—wearing black armbands in protest of the Vietnam war—occurred during school hours and on school grounds.[69] In fact, *Hazelwood* acknowledges that private expression, over which *Tinker* governs, often occurs on school grounds.[70] And while the Complaint alleges there was faculty supervision at SMN and Hocker Grove during the event, it is the <u>degree</u> of involvement that determines whether speech is school sponsored.[71] Indeed, the gravamen of Plaintiffs' claim is that the involvement of school officials went beyond what was permissible under *Tinker*.

---

[68]*Id.* ¶ 31.

[69]*Tinker v. Des Moines Indep. Comm'y Sch. Dist.*, 393 U.S. 503, 509, 512–13 (1969) ("When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without 'materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others.").

[70]*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988).

[71]*Fleming v. Jefferson Cty. Sch. Dist. R-1*, 298 F.3d 918, 924 (10th Cir. 2002).

Finally, the fact that SMN provided for "sanctioned" and "unsanctioned" portions of the walkout does not dictate a finding that the speech was school sponsored. The Court notes that Plaintiffs use the terms "permitted" and "sanctioned" interchangeably in the Complaint in describing the two portions of the SMN event. When read in context, and viewed in the light most favorable to Plaintiffs, these facts are easily synthesized. The District permitted the student walkouts insofar as it advised students and parents that students would not be disciplined for participating in the national walkout for which they sought prior approval. However, the District disclaimed any endorsement or sponsorship of the event. The District then placed certain restrictions on the student speech that would be permitted during the walkouts. At SMN, a subgroup of students participating in the walkout remained at the end of the event to speak freely about gun violence and gun reform, topics that were off limits during the permitted walkout. Only student journalists were prohibited from remaining outside during this portion of the event.

In light of the Complaint's earlier allegations that the District disclaimed all sponsorship of the event, and made clear that the walkout was optional, the Court cannot find on this record that the students' private expressive activities during this bifurcated walkout at one District high school reasonably conveyed to the students, parents, and public that this nationally organized, student-led walkout bore the imprimatur of the school. Instead, the facts as alleged suggest this was a case where the students' speech during the walkout was merely "tolerated," which requires the Court to consider Plaintiffs' claims under the *Tinker* standard.

b.      **Speech Created for the SMN Student Newspaper**

S.W.'s First Amendment claim based on Wenciker confiscating her school-issued camera and disallowing her attendance at the "unsanctioned" walkout event may be subject to a different analysis depending on whether the school's newspaper is considered a nonpublic forum subject

to *Hazelwood*. The parties provided scant meaningful argument in their briefs as to this claim—Defendants argue there is no authority preventing a school district from taking back its own property from a student, while Plaintiffs argue that the First Amendment applies to student journalists. Both arguments may be true, but fail to address the dispositive inquiry: which First Amendment standard applies. A school newspaper is not automatically considered a non-public forum under *Hazelwood*. In *Hazelwood*, the Supreme Court looked at the school district's policies that pertained to the student newspaper, whether it was part of the school curriculum, and the degree of control exercised by school officials over the content of the paper.[72] Only then, after considering a robust record, did the Court determine that a reasonableness standard applied because the newspaper was a nonpublic forum.[73] In contrast, *Tinker* would apply if the District intended "to open the pages of [the newspaper] to 'indiscriminate use,' by its student reporters and editors, or by the student body generally."[74] Here, based on the limited facts alleged, it is plausible that the school opened up the paper as a designated public forum, unlike the newspaper at issue in *Hazelwood*, requiring this Court to apply the more rigorous *Tinker* standard to S.W.'s claims tied to her role as a student journalist.[75]

---

[72]*Hazelwood*, 484 U.S. at 271.

[73]*Id.*

[74]*Id.* at 270 & n.3 (distinguishing *Papish v. Univ. of Mo. Bd. of Curators*, 410 U.S. 667 (1973), which applied *Tinker* to underground newspaper that was merely allowed to be sold on a university campus); *see also Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 47 (1983) (discussing whether school created a public forum); *Dean v. Utica Comm'y Schs.*, 345 F. Supp. 2d 799, 806–07 (E.D. Mich. 2004) (finding student newspaper is a limited public forum where students were allowed to control its operation, students sold advertisements to cover the printing costs, the newspaper had a history of covering controversial topics and permitted guest columns from both students and non-students, and the school's practices evidenced an intent to create a limited public forum).

[75]*See, e.g.*, *Romano v. Harrington*, 725 F. Supp. 687, 690–91 (E.D.N.Y. 1989) (denying summary judgment where genuine issue of fact exists about whether student newspaper bears imprimatur of the school); *Lueneburg v. Everett Sch. Dist. No. 2*, No. C05-2070RSM, 2007 WL 2069859, at *6 (W.D. Wash. July 13, 2007) (same).

## 2. Whether the District's Speech Restrictions Violate the First Amendment

A public school may restrict speech under *Tinker* only if the school "reasonably forecasts it 'would materially and substantially interfere with the requirements of appropriate discipline in operation of the school,' or 'impinge upon the rights of other students.'"[76] *Tinker* does not require that a disruption actually materialize, but the District's forecast must be based on a concrete threat of a substantial disruption.[77] Seeking to avoid controversy, without more, is insufficient to demonstrate a material or substantial threat of disruption.[78]

The Court acknowledges that "[w]hen the speech is neither passive nor silent, restrictions are more readily (but not always) upheld."[79] But the Complaint alleges that the purpose behind restricting students' use of certain words associated with gun control reform was to avoid the appearance that the District was taking a position on Second Amendment issues. A district spokesperson allegedly announced this purpose to a local newspaper. The District neither prohibited the student walkout nor disciplined students for participating. And no alleged facts suggest the District considered the walkout a safety risk beforehand, nor that it feared student expression about gun control would incite violence or disruption among the students.[80] The speech restrictions alleged in this case are more akin to the type of prior restraint that *Tinker* warned against: "In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something

---

[76]*Taylor v. Roswell Indep. Sch. Dist.* 713 F.3d 25, 36 (10th Cir. 2013) (quoting *Tinker v. Des Moines Indep. Comm'y Sch. Dist.*, 393 U.S. 503, 505–06 (1969)).

[77]*Id.* at 37.

[78]*Tinker*, 393 U.S. at 509–10.

[79]*Taylor*, 713 F.3d at 37.

[80]The alleged statements made by Southwick suggesting the District may have been concerned about disruptions or student safety took place after the violations occurred, and therefore do not permit a reasonable inference that the District forecast these concerns ahead of the walkout.

more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."[81]

Because the only justification for the speech restrictions alleged in the Complaint is the need to avoid association with a controversial topic, the Court cannot find at this stage of the litigation that SMSD reasonably forecast that the students' speech during the walkout would cause substantial disruption with discipline or student safety. Therefore, the Court finds that Plaintiffs have stated a plausible claim that their First Amendment rights were violated by the District's speech restrictions during the walkout.

Plaintiff S.W.'s press claims arise out of a SMN assistant principal's conduct disallowing her and other student journalists from attending the "unsanctioned" portion of the walkout, and confiscating S.W.'s school-owned camera. According to the Complaint, the District owned the camera and checked it out to S.W. for the year to use in her role as a student journalist. She was attempting to document the entire walkout for the school newspaper at the time she was removed and her camera confiscated.

To the extent *Tinker* applies to S.W.'s press claim, the motion to dismiss must be denied because no facts alleged in the Complaint suggest that school officials reasonably forecast a substantial disruption or risk to student safety if student journalists were allowed to document the event. Instead, the facts suggest that the only basis for confiscating the camera was to avoid the S.W. potentially documenting a controversial student event. Such an "urgent wish to avoid . . . controversy," standing alone, is not protected under *Tinker*.[82]

---

[81]*Tinker*, 393 U.S. at 509.

[82]*Id.* at 510. *Hazelwood* would require a showing that the school district's conduct was reasonably related to legitimate pedagogical concerns. Although school districts are accorded substantial deference under this standard, *Hazelwood*, 484 U.S. at 273 & n.7, the Court cannot find authority for the proposition that a school's decision to completely prohibit coverage of a student event held on campus is reasonable. At this early stage of the proceeding, the facts as alleged do not demonstrate that the school believed the "unsanctioned" walkout would

In sum, the Court finds that Plaintiffs state a plausible claim under § 1983 for First Amendment violations by the District.

## B. Individual Capacity Claims Against Southwick

Southwick raises the defense of qualified immunity in response to Plaintiffs' § 1983 claims against him in his individual capacity. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'"[83] Qualified immunity gives government officials sued in their individual capacity breathing room to make reasonable but mistaken judgments about open legal questions.[84] To this end, qualified immunity protects officials from liability unless the plaintiff shows (1) the defendant's violation of a constitutional right; and (2) that the right the official violated was "clearly established" at the time of the challenged conduct.[85]

The qualified immunity defense must be resolved "at the earliest possible stage of litigation."[86] For the Court to resolve the issue of qualified immunity at the earliest possible stage of litigation, the complaint must allege enough facts to make clear the grounds on which

---

expose students to material that was inappropriate—if so, one would expect the school to prohibit all students from attending that part of the event, not just student journalists. And, unlike in *Hazelwood*, school officials here did not review the content of a student journalist's work and determine that it would "associate the school with any position other than neutrality on matters of political controversy." *Id.* at 272. Instead, school officials imposed a prior restraint on student journalists' ability to conduct any newsgathering on the event, without regard for whether the journalism would associate the school with a position of neutrality on the subject. For these reasons, the Court is skeptical that the SMN censorship of student journalists during the walkout would survive even a *Hazelwood* analysis.

[83]*Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).

[84]*Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

[85]*Id.* at 735.

[86]*Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008).

the claim rests.[87]  It is within the Court's discretion which of the two prongs of the analysis to address first.[88]  Here, the Court first addresses whether the Plaintiffs allege Southwick violated their constitutional rights.

### 1.    Constitutional Violation

The Court has ruled that Plaintiffs alleged enough facts to state plausible claims under § 1983 for constitutional violations by the SMSD and its employees.  But in a § 1983 action, it is "'particularly important' that 'the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.'"[89]

There are two ways for a government official to be subject to liability in an individual capacity under § 1983.  First, an official may be subject to personal liability, which requires "personal involvement in the alleged constitutional violation."[90]  Second, an official may be subject to supervisory liability, which "allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, [or] implements . . . a policy . . . which subjects, or causes to be subjected that plaintiff to the deprivation of any rights . . . secured by the Constitution."[91] Defendants argue that the Complaint fails to allege facts giving rise to plausible claims against Southwick under either theory of liability.

First, Defendants argue there are no facts alleged in the Complaint that support a theory of personal liability against Southwick—he did not personally confiscate S.W.'s camera, and he

---

[87]*Id.* (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 n.3 (2007)).

[88]*al-Kidd*, 131 S. Ct. at 2080 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[89]*Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)).

[90]*Id.* (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)).

[91]*Id.* (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)).

did not personally promulgate a policy that restricted the students' speech during the walkout. The Court agrees. Paragraph 79 of the Complaint alleges that Southwick "deliberately banned students from discussing guns, gun violence, and school shootings while permitting students' discussion of 'school safety' and other politically neutral topics,"[92] but this is a conclusory allegation. No facts preceding this statement support Plaintiffs' assertion that Southwick personally authored or promulgated the policy. Except for this conclusory statement, the Complaint otherwise attributes the speech policy to the District generally, or to administrators at Hocker Grove and SMN.[93] Factual allegations referring to the "Defendants" are not sufficient to demonstrate that Southwick is personally liable for the alleged constitutional violations.[94]

Plaintiffs assert that Southwick is personally liable for his post-walkout statements threatening similar sanctions against students if future protests occur. But the Complaint cannot be read to put Defendants on notice of this theory of liability against Southwick. The closest Plaintiffs come to stating this theory of relief is in ¶ 80, when they assert that "Southwick's actions following the protests have only confirmed the need for injunctive and declaratory relief to remedy ongoing, irreparable harm to students' First Amendment Rights."[95] This statement does not assert a stand-alone theory of liability based on post-walkout statements by Southwick, it asserts that his post-walkout statements evidence the need for relief on the basis of the earlier constitutional violations that took place on April 20, 2018. Moreover, the Complaint's stated purpose of describing events subsequent to the protests was to show that after the alleged violations, the SMSD was "more concerned about retroactively justifying its actions than it is

---

[92]Doc. 1 ¶ 79.

[93]*See, e.g.*, *id.* ¶¶ 22, 30–31, 33–46, 48, 49–50, 53.

[94]*Brown*, 662 F.3d at 1165 (citing *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008)).

[95]Doc. 1 ¶ 80.

with remedying its free-speech and free-press violations."[96]  The Complaint asserts theories of relief under § 1983 based on constitutional violations by Southwick and the District on April 20, 2018; it does not state a separate claim for liability based on Southwick's subsequent conduct.

Plaintiffs also assert that Southwick is liable under a supervisory liability theory.  To establish supervisory liability against Southwick, Plaintiff must show "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."[97]  Neither party directly addresses this well-established test in their briefs.[98]

Plaintiffs fail to allege sufficient facts demonstrating the personal participation prong of this test as to Southwick.  Despite the previously-referenced conclusory allegation in ¶ 79, there are no factual allegations that Southwick was responsible for the policies restricting speech and press at Hocker Grove and SMN.  "Various officials often have 'different powers and duties.'  A plaintiff must therefore identify the specific policies over which particular defendants possessed

---

[96]*See, e.g.*, *id.*  ¶¶ 57, 65–66, 86.

[97]*Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

[98]Plaintiffs incorrectly assert that supervisory liability applies when the defendant is deliberately indifferent to a plaintiff's constitutional rights.  Doc. 16 at 18–19.  The state of mind element of a supervisory liability claim is determined by the type of claim brought.  *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 769 (10th Cir. 2013).  A Fourteenth Amendment claim, for example, requires the plaintiff to show that the defendant acted with deliberate indifference.  *Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018).  A First Amendment claim requires the plaintiff to show that the defendant "adopted and implemented the . . . policies at issue, not for viewpoint-neutral reasons, 'but for the purpose of discriminating on account of' the particular message plaintiffs wished to convey.'" *Pahls v. Thomas*, 718 F.3d 1210, 1231 (10th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).  In contrast, for municipal liability to attach, Plaintiffs must show that the challenged policy "was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury."  *Schneider*, 717 F.3d at 769.  The Court does not reach the state of mind question on supervisory liability because Plaintiffs did not allege facts sufficient to meet the personal involvement prong of the supervisory liability test.  And because Plaintiffs' official capacity claims against Southwick are dismissed, and Defendants do not otherwise challenge the official capacity claim in this case, the Court need not consider the deliberate indifference standard for municipal liability in deciding this motion.

responsibility and that led to the alleged constitutional violation."[99]  Moreover, "*Iqbal . . .* articulated a stricter liability standard for this first element of personal involvement. . . . [A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[100]

Plaintiffs fail to identify facts in their response brief to support Southwick's responsibility for the challenged policy.  Instead, they argue that he ratified the conduct of individual administrators at Hocker Grove and SMN, and that his failure to later take remedial actions after Plaintiffs complained subjects him to supervisory liability.  Although ratification may be a basis for municipal liability, ratification standing alone is insufficient to state a claim for supervisory liability under § 1983.[101]

Plaintiffs contend that acquiescence to the unlawful treatment of a plaintiff can form the basis of supervisory liability.  But their reliance on unpublished decisions in *Barnes v. St. Francis Community Services* and *Fleetwood v. Werholtz* is misplaced.  *Barnes* declined to dismiss a complaint alleging supervisory liability where the plaintiff alleged the supervisor had received complaints about an employee's performance and sexual misconduct issues and then failed to monitor or supervise him, leading to the constitutional violations.[102]  In *Fleetwood*, the court declined to dismiss where the plaintiff alleged a prison warden was aware of facts that helped create the culture giving rise his employee's constitutional violations, and "considering

---

[99]*Pahls*, 718 F.3d at 1226 (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532–33 (10th Cir. 1998)).

[100]*Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 768 (10th Cir. 2013).

[101]*Jordan v. Unified Gov't of Wyandotte Cty.*, 100 F. Supp. 3d 1111, 1120 (D. Kan. 2015); *cf. Bryson v. City of Okla. City*, 627 F.3d 784, 788-791 (10th Cir. 2010) (discussing ratification in context of <u>municipal liability</u> claim).

[102]No. 16-1281-EFM-GLR, 2017 WL 2666099, at *5 (D. Kan. June 21, 2017).

the mass of factual allegations contained in the lengthy second amended complaint."[103]  Unlike in *Barnes* and *Fleetwood*, there are no facts alleged in Plaintiffs' Complaint that would allow for a reasonable inference that Southwick had information ahead of time that would lead him to believe that school officials at Hocker Grove and SMN would violate Plaintiffs' First Amendment rights.  There are no facts to suggest the alleged censorship in this case had previously occurred, or that certain officials had a history of conduct that would cause a reasonable supervisor to monitor and supervise them more closely.  Mere knowledge of the planned walkout, without more, does not support personal participation by way of acquiescence.

Moreover, the Court agrees with Defendants that the alleged facts regarding Southwick's investigation and response to the ACLU's First Amendment complaints after April 20, 2018, have no bearing on whether Southwick is liable under a supervisory liability theory.  For supervisory liability to attach, Plaintiff must show that the defendant's personal participation caused the complained of constitutional harm, which requires a showing that the defendant "set in motion a series of events that [he] knew or reasonably should have known would cause others to deprive [Plaintiffs] of [their] constitutional rights."[104]  Of course, Southwick's investigation of the alleged constitutional violations could not cause the underlying constitutional violation. "[B]asic principals of linear time prevent us from seeing how conduct that occurs after the alleged violation could have somehow caused that violation."[105]

In sum, the Court is unable to find that Plaintiffs satisfied the first prong of the qualified immunity test by showing that Southwick personally violated their constitutional rights, either by

---

[103]No. 10-2480-RDR, 2011, 2011 WL 2938106, at *5 (D. Kan. July 19, 2011).

[104]*Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018) (quoting *Schneider*, 717 F.3d at 768).

[105]*Durkee v. Minor*, 841 F.3d 872, 877 (10th Cir. 2016) (quoting *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009)).

demonstrating sufficient facts of personal or supervisory liability.  To the extent Plaintiffs'

claims are premised on Southwick's post-walkout conduct, they cannot satisfy the causation

prong of their supervisory liability claim.


### 2.     Clearly Established

Even if Plaintiffs were able to satisfy the first prong of the qualified immunity test, the

Court finds that they cannot demonstrate that their rights were clearly established.  "For a

constitutional right to be clearly established, the contours of the right must be sufficiently clear

that a reasonable official would understand that what he is doing violates that right."[106]  A

plaintiff may satisfy the "clearly established" requirement "by identifying an on-point Supreme

Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of

authority from other courts must have found the law to be as the plaintiff maintains.'"[107]  To

apply this test, the Court "must not define the relevant constitutional right 'at a high level of

generality.'"[108]  Instead, "clearly established law must be particularized to the facts of the

case."[109]  Importantly, because the theory of liability against Southwick is premised on

supervisory liability, Plaintiffs in this case must show that on April 20, 2018, "clearly established

---

[106]*Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013) (quoting *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013)).

[107]*Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) (quoting *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015)).

[108]*Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)).

[109]*Id.* (quoting *White*, 137 S. Ct. at 552).

law . . . would . . . have put a reasonable official in [Southwick's] position on notice that his supervisory conduct would violate [Plaintiffs'] constitutional rights."[110]

Therefore, for Plaintiffs to meet the clearly-established prong of the qualified immunity test, the Court first "must identify a case where an offic[ial] acting under similar circumstances as [Southwick] was held to have violated" the First Amendment under a theory of supervisory liability.[111]  Plaintiffs argue: (1) Southwick was on fair notice that *Tinker* should apply, and there was fair notice that the District could not meet the substantial disruption test; and (2) Southwick was on fair notice that demonstrators have a clearly established right to engage in protest at a school as long as it does not cause a material and substantial disruption.  The case law upon which Plaintiffs rely fails to meet the exacting standard required for them to demonstrate that the law was clearly established.

First, Plaintiffs' reliance on the *Tinker* standard defines the constitutional right involved at too high a level of generality.  The question is not whether *Tinker* applies under the facts alleged.  The question is whether a Supreme Court, Tenth Circuit, or weight-of-authority case exists that would have put Southwick on notice that his supervisory conduct—allegedly ratifying and failing to discipline First Amendment violations despite having advance notice of the need to protect students' First Amendment rights—would violate the students' constitutional rights. Plaintiffs first cite to *Tinker,* and distinguish the facts in *Hazelwood* and *Fleming*.  But none of these cases addressed supervisory liability.  *Tinker* was decided after an evidentiary hearing, and concerned a school policy that any student wearing an armband to protest the Vietnam War

---

[110]*Id.* (quoting *Cox*, 800 F.3d at 1247) (emphasis in original).

[111]*Id.* at 1124 (quoting *White*, 137 S. Ct. at 552).

would be asked to remove it, and if the student refused, would be disciplined.[112]  On that record "[t]he principals of the Des Moines schools became aware of the plan to wear armbands," and "met and adopted" the policy challenged in that case.[113]  Unlike in *Tinker*, there are no facts alleged about Southwick's role in the speech restrictions at issue.  Instead, factual allegations about Southwick's role in the policy are based on his conduct after the alleged violations.  *Taylor* is also inapposite.  That case provides no guidance about individual or supervisory liability because the plaintiffs only brought official capacity claims against the school district and its superintendent.[114]

Next, Plaintiffs cite two cases for the proposition that Southwick was on fair notice that student walkout demonstrators have a clearly established right to engage in protest on campus under the *Tinker* standard.  In *William v. Eaton*,[115] the Tenth Circuit applied *Tinker* to another armband policy, worn by members of a state university football team during a football game to protest certain policies by the opposing team.  Again, this case does not discuss supervisory liability—it involved only official capacity claims against the university.[116]  Moreover, it was decided before the *Hazelwood* exception to the *Tinker* standard was developed in 1988.  For the reasons discussed in Subpart A, Plaintiffs' recitation of the law that "school officials cannot ban students from engaging in political speech on campus absent a credible threat of material or substantial disruption" is incorrect.[117]  *Hazelwood* created one of several exceptions to this rule,

---

[112]393 U.S. 503, 509–10 (1969) (explaining district court made no finding of substantial disruption and "our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of armbands would substantially interfere with the work of the school").

[113]*Id.* at 504.

[114]*Taylor v. Roswell Indep. Sch. Dist*, 713 F.3d 25, 29 (10th Cir. 2013).

[115]443 F.2d 422 (10th Cir. 1971).

[116]*Id.* at 429.

[117]Doc. 16 at 22.

and Plaintiffs cannot show that clearly established law would cause a reasonable supervisor like Southwick to know that the restrictions imposed by SMSD in this case would not be considered school sponsored, and thus subject to a less rigorous standard.

Plaintiffs' reliance on *PeTA v. Rasmussen*[118] is also misplaced for the proposition that "on-campus demonstrators have a 'clearly established right to engage in protest so long as no material disruption occurred.'"[119]  That case involved non-student protesters across the street from a junior high school, who were protesting the school's display of a flag from McDonald's, one of the school's sponsors.[120]  A school district police officer threatened to arrest the protesters under a Utah statute that criminalizes entry into a school building, ground, street, sidewalk, or public way next to school grounds, if it interferes with or disrupts the school if the person does not leave or returns within 72 hours after being asked to leave.[121]  The Tenth Circuit considered PeTA's challenge to the Utah statute's constitutionality, and the police officer and school principal's qualified immunity defense.[122]  For purposes of qualified immunity, the Tenth Circuit relied on legal authority that "clearly established the right to engage in expressive activity on a sidewalk adjacent to a school if no material disruption occurs," and found that the defendants were not entitled to qualified immunity.[123]   In contrast, this case involves a protest on school grounds, strictly by students, during school hours.  These facts arguably trigger the *Hazelwood* exception to *Tinker*, which would require a showing less rigorous than material disruption to be

---

[118]298 F.3d 1198 (10th Cir. 2002).

[119]Doc. 16 at 22 (quoting *id.* at 1207).

[120]*PeTA*, 298 F.3d at 1201.

[121]*Id.* (discussing Utah Code Ann. § 76-8-710).

[122]*Id.* at 1203, 1207.

[123]*Id.* at 1207 (citing *Tinker v. Des Moines Indep. Comm'y Sch. Dist.*, 393 U.S. 503, 509 (1969); *Grayned v. City of Rockford*, 408 U.S. 104, 118 (1972)).

permissible.  Unsurprisingly, the *PeTA* case does not reference *Hazelwood* given that it was clearly inapplicable to its facts.  The Tenth Circuit's *PeTA* decision would not put a reasonable superintendent on notice that his supervisory actions regarding the student protest at issue here would violate students' First Amendment rights.

In sum, Plaintiffs have not demonstrated that the law is clearly established such that a reasonable official would have understood that his supervisory conduct violated Plaintiffs' First Amendment rights.  At most, Southwick's post-walkout statements suggest he was given conflicting legal advice after-the-fact about whether *Tinker* or *Hazelwood* governed the District's policies.  This is insufficient to demonstrate that Southwick was on notice that his supervisory conduct would have violated their First Amendment rights.

Moreover, even if the Court considered the underlying speech restrictions, there is no clearly established law that they are not governed by *Hazelwood*, which would have given school officials more latitude to restrict speech, including for viewpoint-based reasons.[124]  Under *Hazelwood*, a school district can control school-sponsored speech as long as it was "reasonably related to legitimate pedagogical concerns," which includes "the school's prerogative to not 'associate [itself] with any position other than neutrality on matters of political controversy."[125] There are no on-point Supreme Court or Tenth Circuit cases that dictate a First Amendment violation on these facts.  Nor does the weight of clearly established authority in other courts establish that Southwick's supervisory conduct would violate Plaintiffs' constitutional rights.

In sum, even if Plaintiffs alleged plausible facts giving rise to Southwick's supervisory liability on the § 1983 claims, they could not show that their rights are clearly established.  Thus,

---

[124]*Fleming v. Jefferson Cty. Sch. Dist. R-1*, 298 F.3d 918, 926–29 (10th Cir. 2002) (holding *Hazelwood* does not require viewpoint neutrality).

[125]*Id.* at 924 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272–73 (1988)).

the motion to dismiss the individual-capacity claims against Southwick is granted on the basis of qualified immunity. The official-capacity claims under § 1983 against SMSD remain, as Plaintiffs have stated a plausible claim for relief under the facts alleged that the District's policies and conduct during the walkout violated their First Amendment rights under the standard announced in *Tinker*.

## IV. Kansas Student Publications Act Claim

In Count III, Plaintiff S.W. alleges a violation of the Kansas Student Publications Act ("KSPA" or "the Act"). The Act was passed by the Kansas Legislature in 1992, following the *Hazelwood* decision. Kansas, along with seven other states, adopted statutes after *Hazelwood* designed to restore the *Tinker* standard to speech in student publications.[126] Courts in other states with similar legislation have recognized that these statutes codify the standard from *Tinker* in response to the *Hazelwood* decision, to give student journalists greater protection from speech restrictions.[127] The KSPA provides in relevant part:

> (a) The liberty of the press in student publications shall be protected. School employees may regulate the number, length, frequency, distribution and format of student publications. Material shall not be suppressed solely because it involves political or controversial subject matter.
>
> . . . .
>
> (c) Publication or other expression that is libelous, slanderous or obscene or matter that commands, requests, induces, encourages, commends or promotes conduct that is defined by law as a crime or conduct that constitutes a ground or grounds for the suspension or expulsion of students as enumerated in K.S.A. 72-6114, and

---

[126]*See generally* Tyler J. Buller, The State Response to *Hazelwood v. Kuhlmeier*, 66 Me. L. Rev. 109–16 (2013) (discussing "anti-*Hazelwood* statutes" such as the KSPA).

[127]*See, e.g., Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1236 (10th Cir. 2009) ("section 22-1-120 was passed by the Colorado legislature in the wake of *Hazelwood* and the concern regarding its impact on student newspapers); *Lange v. Diercks*, No. 11-1091, 2011 WL 5515152, at *6–7 (Iowa Ct. App. Nov. 9, 2011) (finding that the Iowa General Assembly enacted similar legislation "for the purpose of giving students more robust free-expression rights than those articulated by the Supreme Court [in *Hazelwood*].").

amendments thereto, or which creates a material or substantial disruption of the normal school activity is not protected by this act.[128]

## A.        Private Right of Action

Defendants' first ground for dismissal is that the KSPA does not provide for a private right of action.  There is no precedent interpreting this statute, or considering whether it provides a private right of aaction.  Kansas courts recognize that most statutes do not explicitly confer a civil remedy on potential plaintiffs.[129]  However, a private right of action may be implied.[130]  In Kansas, the determination of whether a private right of action exists under a statute is a question of law.[131]  Kansas courts make this determination by applying the following two-part test: (1) "the party must show that the statute was designed to protect a specific group of people rather than to protect the general public," and (2) "the court must review legislative history to determine whether a private right of action was intended."[132]

When addressing the first part of the test, Kansas courts look to the statute's enabling legislation.[133]  K.S.A. § 72-7211(a) pronounces that "[t]he liberty of the press in student publications shall be protected" and that such "material shall not be suppressed solely because it involves political or controversial subject matter."[134]  As Defendants concede, the plain language

---

[128]K.S.A. § 72-7211(a), (c).

[129]*Shirley v. Glass*, 308 P.3d 1, 5 (Kan. 2013).

[130]*Jahnke v. Blue Cross & Blue Shield of Kan., Inc.*, 353 P.3d 455, 463 (Kan Ct. App. 2015) (citing *Pullen v. West*, 92 P.3d 584, 594 (Kan. 2004)).

[131]*Pullen*, 92 P.3d at 594.

[132]*Id.* (citing *Nichols v. Kan. Political Action Comm.*, 11 P.3d 1134 (Kan. 2000); *Nora H. Ringler Revocable Family Tr. v. Meyer Land & Cattle Co.*, 958 P.2d 1162 (Kan. Ct. App. 1998)).

[133]*See id.* at 595; *Jahnke*, 353 P.3d at 464–65.

[134]K.S.A. § 72-7211(a).

of the statute supports a finding that it was designed to protect a specific group of people—student journalists.

Defendants argue that the second part of the test is not met.  First, they argue that no language in the Act itself suggests the legislature intended to create a private right of action. While some statutes expressly impose personal liability, the absence of such an express provision does not necessarily negate legislative intent that the statute creates a private right of action.[135] In the absence of express provisions, the legislative intent to grant or withhold such a right is determined primarily from the language of the statute.[136]  Courts may also consider the nature of the evil sought to be remedied and the purpose the statute was intended to accomplish.[137]

The problem sought to be remedied by the plain language of the statute was an encroachment on student journalists' right of expression in student publications; specifically, censorship of student journalism that is "political or controversial."  The statute reestablished the standards in place before *Hazelwood* by codifying the *Tinker* standard in subsection (c) for student speech not otherwise prohibited because it is slanderous, libelous, obscene, or a matter "that commands, requests, induces, encourages, commends or promotes conduct that is defined by law as a crime or conduct that constitutes a ground or grounds for the suspension or expulsion of students as enumerated in K.S.A. 72-6114."[138]

To accomplish the statute's stated purpose of protecting student journalists from censorship of political or controversial material, the statute makes clear that their "material" may not be "suppressed solely because it involves political or controversial subject matter."  Yet, the

---

[135]*Id.* at 593.

[136]*Id.* at 593–94.

[137]*Id.* at 594.

[138]§ 72-711(c).

statute provides for no enforcement mechanism at all—there is no administrative or regulatory procedure, nor is there a criminal penalty for violations.[139] As Plaintiffs point out, to disallow a private right of action would leave a rights-creating statute with no enforcement mechanism.

Defendants assert that the primary purpose of the Act is to immunize school districts and their employees from liability stemming from student publications, citing subsection § 72-211(e). While this subsection provides immunity for school officials based on expression contained in student publications, this was clearly not the primary purpose of the statute. As previously discussed, the purpose of the statute was to protect student journalists' freedom of expression and prohibit censorship of journalism based on controversial subjects. This purpose was announced in the first subsection of the statute.

Moreover, the Court considers the legislative history in determining legislative intent.[140] The KSPA's legislative history makes clear that the legislature intended to codify under state law the *Tinker* standard in the wake of *Hazelwood*. This legislative history demonstrates support for the Act's protection of student journalists, and their right to expression on controversial subjects without censorship.[141] Moreover, the Court agrees with Plaintiffs that § 72-7211(e) does not "shift" liability from school district officials to students, but instead was intended to override *Hazelwood*'s formulation of school-sponsored speech—that subsection clarifies that the contents

---

[139]*See Pullen*, 92 P.3d at 597 (explaining that where a statute creates criminal or administrative remedies for violations, courts should not infer intent to also create a civil provide right of action); *Nichols v. Kan. Political Action Comm.*, 11 P.3d 1134, 1144–45 (Kan. 2000) (finding lack of legislative intent to create private right of action where statute "designed a comprehensive scheme for enforcement" through state administrative agency); *McEachern v. Morris*, No. 117,253, 2018 WL 910935, at *10 (Kan. Ct. App. Feb. 16, 2018) (finding no intent to create private right of action where statute provided for "detailed regulatory and enforcement procedures administered through Kansas Board of Nursing").

[140]*Nichols*, 11 P.3d at 1145.

[141]Doc. 16-1.

of student publications are the students' private speech, rather than speech that is sponsored by the school.[142]

K.S.A. § 72-7211 was explicitly designed to protect student journalists from censorship and reassert the *Tinker* standard under Kansas law for school-sponsored speech. Given the legislative history confirming the legislature's intent to protect student journalists from censorship,[143] and the fact that other states with similar statutes have allowed for private rights of action to proceed,[144] the Court finds that K.S.A. § 72-7211 implies a private right of action.

### B.      Whether Plaintiffs Have Stated a Claim under the KSPA

Defendants next argue that even if Plaintiffs have a private right of action under the statute, they failed to allege sufficient facts to demonstrate a plausible violation. The Court disagrees for the same reasons it allowed Plaintiff S.W.'s § 1983 claim to proceed—Plaintiffs have alleged sufficient facts in the Complaint to state a plausible claim that the SMSD violated *Tinker* when school officials confiscated her school-issued camera, and barred her from the post-walkout gathering at SMN. As previously noted, the First Amendment protects the creation of speech, including the recording of matters of public interest.[145] Moreover, the plain meaning of the term "material" as used in K.S.A. 72-7211, is "[t]he things that are used for making or doing something" or "[i]nformation, ideas, data, documents, or other things that are used in reports, books, films, studies, etc."[146] The District's act of confiscating S.W.'s camera—alleged to have

---

[142]*See* K.S.A. § 72-7211(e) ("No publication or other expression of matter by students in the exercise of rights under this act shall be deemed to be an expression of school district policy. . . .").

[143]Doc. 16-1 at 12 ("We [the ACLU] welcome the efforts of the legislature to undo the damage of Hazelwood.").

[144]*See Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1236 (10th Cir. 2009); *Lange v. Diercks*, No. 11-1091, 2011 WL 5515152, at *6–7 (Iowa Ct. App. Nov. 9, 2011); *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 113 (D. Mass. 2003).

[145]*See, e.g.*, *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017).

[146]*Material*, Black's Law Dictionary (10th ed. 2014).

been loaned to her by the school to be used in her capacity as a student journalist—suppressed photographic material that would have been used in a student publication.  In fact, according to the facts alleged, the entire point of confiscating the camera was to prevent S.W. from photographing the event for the student newspaper.  The Complaint further alleges that the only reason the material was suppressed was because it would have documented political or controversial subject matter.  Thus, Plaintiffs have sufficiently pled a violation of subsection (a).

For the reasons already explained, under a *Tinker* analysis Plaintiffs state a plausible claim that Defendants violated their First Amendment rights by confiscating S.W.'s  camera and barring her attendance at the full walkout event without an adequate showing that the District reasonably forecast that student journalism about the subject matter would have created a material or substantial disruption of normal school activity, or created a safety risk.  Because K.S.A. § 72-7211(c) incorporates this standard, Plaintiffs also state a plausible claim for relief on their state law claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Joint Motion to Dismiss Plaintiffs' Complaint (Doc. 8) is **granted in part and denied in part**.  The motion is granted as to Count I, the § 1983 claims asserted against Defendant Southwick.  The motion is otherwise **denied**.

**IT IS SO ORDERED.**

Dated: January 28, 2019

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE